UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**26-CR-20018-BLOOM/ELFENBEIN**
Case No. _____

21 U.S.C. § 846
21 U.S.C. § 853

UNITED STATES OF AMERICA

vs.

ATLANTIC BIOLOGICALS CORP.,

Defendant.
_____/

FILED BY **BM** D.C.

**Jan 12, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## INFORMATION

The United States Attorney charges:

### GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise specified:

#### Statutory and Regulatory Background

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. Under the CSA, it was unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance, "except as authorized" under Title 21, United States Code.

2. The Drug Enforcement Administration ("DEA") enforced the CSA and its implementing regulations by, among other things, approving registrations for manufacturers and distributors of controlled substances. A DEA registration authorized transactions within the legitimate distribution chain. Manufacturers, distributors, or other individuals registering with the DEA were referred to as "registrants."

3. The CSA assigned controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision. Any registrant that received controlled substances with the highest potential of abuse out of the drugs with currently accepted medical uses in treatment in the United States—i.e., those assigned to Schedule II—had to issue a DEA Form 222 to the registrant supplying the drugs. 21 U.S.C. § 828.

4. It was unlawful for any person to use a DEA Form 222 to obtain "controlled substances for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research." *Id.* § 828(e). Conversely, it was unlawful for a registrant to distribute a Schedule II controlled substance to any person who the registrant knew or intended was obtaining the controlled substance for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research in the course of his legitimate business. *See* 21 U.S.C. § 843(a)(1).

5. Just as distributors could sell controlled substances to one another, and to pharmacies, when authorized to do so by law, an appropriately licensed and registered pharmacy was authorized to dispense a controlled substance to a patient, but only pursuant to a valid prescription issued for a legitimate medical purpose by a doctor or other practitioner acting in the usual course of professional practice. 21 C.F.R. §§ 1306.04, 1306.06.

### The Greater Houston Area

6. The greater Houston area ("the Houston area") included the following counties in the State of Texas: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

7. The Houston area was a nationally recognized "hot zone" for pill-mill clinics and pharmacies involved in diverting certain controlled substances onto the black market.

### The Commonly Abused Prescription Drugs

8. The following controlled substances in Schedule II were most often diverted onto the black market in the Houston area:

   a. Hydrocodone was an opioid classified as a Schedule II controlled substance. Hydrocodone was a narcotic analgesic used to treat moderate to moderately severe pain and, like other opioids, was among the most addictive drugs used in medicine. The highest-strength quick-release hydrocodone pill commercially available—and the one most in demand on the Houston area's black market—contained 10 mg of hydrocodone bitartrate and 325 mg of the non-narcotic analgesic acetaminophen. Hydrocodone 10-325 mg combination pills typically had a Houston area street value of around $1 per milligram.

   b. Oxycodone was an opioid classified as a Schedule II controlled substance. Oxycodone was a more powerful narcotic painkiller than hydrocodone, having twice hydrocodone's potency per milligram. The highest-strength short-acting oxycodone pill commercially available—and the one most in-demand on the Houston area's black market—contained 30 mg of oxycodone hydrochloride. The oxycodone combination pill containing 10 mg of oxycodone hydrochloride and 325 mg of acetaminophen was high in demand on Houston area's black market. The street value of oxycodone's 30 mg and 10-325 mg pills was approximately $1 per milligram.

   c. Hydromorphone was an opioid classified as a Schedule II controlled substance. Hydromorphone was a more powerful narcotic painkiller than oxycodone, typically prescribed when other medication was unsuccessful. The highest-strength short-acting hydromorphone pill commercially available—and the one most in-demand on the Houston area's black market—contained 8 mg of hydromorphone hydrochloride. The street value of hydromorphone 8 mg pills was at least $1 per milligram.

(Collectively, the Schedule II opioids in the strengths described are the "Commonly Abused Opioids.")

9. In addition to the Commonly Abused Opioids, the following controlled substances were also frequently diverted onto the Houston area's black market:

   a. Carisoprodol was a Schedule IV controlled substance classified as a muscle relaxant. The highest-strength carisoprodol pill commercially available—and the one most in-demand on the Houston area's black market—was the 350 mg pill. Carisoprodol 350 mg typically sold on the street for $5 dollars or more per pill.

   b. Alprazolam was a Schedule IV controlled substance used to treat anxiety. The highest-strength alprazolam pill commercially available—and the one most in-demand on the Houston area's black market—was the 2 mg pill. The street value of alprazolam 2 mg pills was typically $5 or more.

   c. Promethazine with codeine was a Schedule V controlled substance classified as a cough suppressant. The street value of a pint of promethazine with codeine syrup was $1,000 or more.

(Collectively, carisoprodol, alprazolam, and promethazine with codeine are "Potentiators," so called for their reputation on the black market of enhancing the high from the Commonly Abused Opioids. Together, the Commonly Abused Opioids and Potentiators are the "Commonly Abused Prescription Drugs.")

### Diversion of Commonly Abused Prescription Drugs onto the Houston Area's Black Market

10. One way that Commonly Abused Prescription Drugs were "diverted"—funneled onto the Houston area's black market—was through pill-mill pharmacies, which typically serviced only customers seeking to pay cash to acquire Commonly Abused Prescription Drugs for non-medical purposes. These pharmacies deployed different schemes designed to provide them access to some of the black-market profit generated by the Commonly Abused Prescription Drugs, while also helping the pharmacies to evade detection by law enforcement:

  a. The "traditional" pill mill required individuals posing as patients to show up, in person, to receive illegitimate prescriptions from complicit doctors and then travel to complicit pharmacies to fill them.

  b. "Counterfeit-prescription" operations typically involved drug trafficking organizations forging prescriptions and identification cards, bringing them to a complicit pharmacy in bulk, and paying large sums of cash for batches of the drugs.

  c. "Back door" operations—known to law enforcement as "ghosting" pharmacies—dispensed with doctors, patients, and prescriptions altogether, relying on established relationships with complicit distributors and their representatives to order as many of the Commonly Abused Prescription Drugs as possible and sell the drugs in bulk, directly to drug traffickers, before shuttering the pharmacy and repeating the process with one or several more.

11. Houston area pill-mill pharmacies often exhibited numerous "red flags" of diversion well-known throughout the pharmaceutical industry, which were also enumerated by the Texas State Board of Pharmacy ("TSBP") in *Red Flags Check List for Pharmacies, YOU MIGHT BE A PILL MILL IF….*, which TSBP regularly distributed to licensed pharmacies. These red flags included:

  a. filling a reasonably discernible <u>pattern of substantially identical prescriptions</u> for the same controlled substances or combinations of controlled substances;

  b. routinely filling <u>prescriptions for known drugs of abuse, alone or in combination</u>, including opioids, benzodiazepines (like alprazolam), and muscle relaxants;

  c. routinely filling prescriptions for the <u>highest strength</u> and/or for <u>large quantities</u> of these drugs;

  d. charging <u>above-market rates</u> and accepting <u>mostly/only cash or credit (instead of insurance)</u> for known drugs of abuse; and

  e. routinely ordering controlled substances from <u>more than one drug supplier</u>.

12. Houston area pill mills commonly procured Commonly Abused Prescription Drugs from a collection of out-of-state "secondary" distributors—small-to-mid-size distributors that charged the pharmacies substantially over-market prices for the drugs. The pill-mill pharmacies readily paid the premium, because they still made large profits selling the drugs onto the black market for hundreds or even thousands of dollars in cash per bottle.

13. The secondary distributors typically implemented ordering restrictions like "caps" (limiting the number of Commonly Abused Prescription Drugs that a pharmacy could purchase per month) and "ratios" (requiring Houston area pharmacies to purchase a set number of non-controlled pills for every Commonly Abused Prescription Drug pill—even if the pharmacies purchased the same cheap generics, month after month, to meet the distributor's ratio requirement). The secondary distributors also typically documented perfunctory "due diligence," including questionnaires completed by the pharmacies or reports from third-party onsite inspections. These measures often were not effective in preventing Houston area pill mills from obtaining the Commonly Abused Prescription Drugs from the secondary distributors.

14. The secondary distributors often adopted price lists, customer lists, and purported compliance measures for selling Commonly Abused Prescription Drugs to Houston area pharmacies from industry middlemen ("brokers") with established books of Houston area pharmacy business. The brokers were free agents—independent contractors who often represented several secondary distributors at once. They knew which colors or brands of Commonly Abused Pharmaceutical Drugs the Houston area pharmacies preferred—for example, the blue-colored oxycodone 30 mg that gave that Commonly Abused Opioid pill its street name, the "blues." These preferences were not based on any legitimate medical purpose, but rather on street demand. In exchange for the access and profits the brokers provided, the secondary distributors paid the brokers sizeable commissions on the sales they facilitated.

## THE DEFENDANT AND RELEVANT INDIVIDUALS

15. Atlantic Biologicals Corporation ("Atlantic") was a pharmaceutical wholesaler with its principal place of business in Miami, Florida, and its primary warehouse in North Carolina. Atlantic was divided into two distinct business units: Atlantic Biologicals, the primary business unit which served the hospital channel, and National Apothecary Services ("NAS"), a smaller unit

6

that focused on independently owned pharmacies, to which it sold the Commonly Abused Prescription Drugs, other controlled and non-controlled drugs, and medical goods.

16. Proven Rx Sales LLC ("Proven") was a purported pharmaceutical consulting company based in Miami, Florida.

17. Joshua Weinstein ("Weinstein"), a resident of the Southern District of Florida, held the title of President of NAS.

18. Derrick Chad Atkinson ("Atkinson") resided in the Eastern District of North Carolina. Atkinson was an independent contractor for Proven, and, beginning in or around 2017, he also became a non-exclusive, independent sales representative contracted by NAS who handled relationships with Houston area pharmacies. He became a full-time sales employee for NAS in September 2021.

19. Jason Smith ("Smith"), a resident of the Southern District of Florida, owned and operated Proven, and was responsible for Proven's relationship with NAS.

20. Joseph Pesserillo ("Pesserillo"), a resident of the Southern District of Florida, was a sales representative for Proven who handled relationships with Houston area pharmacies.

21. Cassandra Rivera ("Rivera"), a resident of the Southern District of Florida, was a sales representative for Proven who handled relationships with Houston area pharmacies.

### NAS' SALES OF COMMONLY ABUSED PRESCRIPTION DRUGS TO HOUSTON AREA PILL-MILL PHARMACIES

22. In or around 2017, Atkinson brought Proven's business model for selling Commonly Abused Prescription Drugs to Houston area independent pharmacies to NAS. This model involved selling the Commonly Abused Prescription Drugs at a large markup, while capping the pharmacy customers' monthly purchasing allocations; requiring pharmacies to purchase non-controlled substances in no less than a 4:1 ratio to the Commonly Abused

7

purchased; and implementing compliance measures that were circumvented to mostly facilitate, instead of prevent, diversion.

23. Atkinson initially facilitated sales of Commonly Abused Prescription Drugs from NAS to Houston-area pharmacies while acting as a representative of Proven and independent contractor for NAS. Atkinson then became a sales representative employed at NAS, where he continued to facilitate sales of Commonly Abused Prescription Drugs to Houston-area pharmacies. After Atkinson's arrival, NAS adopted the sales practices described in paragraph 22.

24. In or around June 2017, Weinstein became NAS's direct sales representative for Creative Care, a Houston area pharmacy, and helped Creative Care's owner Kesha Harris increase her purchasing limits for the Commonly Abused Prescription Drugs despite many red flags for diversion, including Creative Care's location in the Houston area "hot zone"; Harris's interest in purchasing as many of the Commonly Abused Prescription Drugs as she could get from NAS; Harris's lack of concern for the non-controlled substances NAS required her to purchase to maximize her purchases of controlled substances; Harris's interest in brands and colors of the Commonly Abused Prescription Drugs; and Harris's willingness to pay well over-market rates to acquire the Commonly Abused Prescription Drugs and the non-controlled substances required to meet NAS's ratios.

25. Atkinson served as NAS's direct sales representative for Houston area pharmacies that purchased the Commonly Abused Prescription Drugs, including but not limited to Ennis Street Pharmacy, Keystone Pharmacy, a group of pharmacies owned and/or operated by Dwain Ross, a high ranking member of a drug trafficking organization, and another group of pharmacies owned by another high ranking member of a drug trafficking organization. These pharmacies exhibited red flags for diversion, including rarely ordering any controlled drug, in any strength, other than

the Commonly Abused Prescription Drugs; almost always ordering as many of the Commonly Abused Prescription Drugs as NAS would sell them per month; expressing strong preferences for Commonly Abused Prescription Drugs in certain colors and shapes; ordering non-controlled drugs in suspicious patterns, including almost always ordering large quantities and limited varieties, in exactly the number necessary to order their monthly limits of Commonly Abused Prescription Drugs; a willingness to pay well-over-market prices to acquire both the Commonly Abused Prescription Drugs and the non-controlled drugs required to meet NAS's ratios; maintaining hours of operation inconsistent with those of a legitimate pharmacy; and submitting photos with the pharmacies' applications to purchase depicting locations in strip malls with bars on the windows and doors and nothing for sale in the areas accessible to customers, only pick-up and drop-off windows.

26. Proven used NAS as a source of supply for certain of Proven's customers in the Houston area that had large demand for the Commonly Abused Prescription Drugs, including Chrisco Pharmacy, K-Med Pharmacy, and others, each of which exhibited red flags for diversion. NAS retained Proven and compensated the company with substantial commissions because, among other things, Proven's customers were willing to pay substantially over-market prices for the Commonly Abused Prescription Drugs and non-controlled substances; Proven provided access to its customer and price list, its specialized knowledge about market preferences which were based on black market demands like pill color, and its sales force, including Pesserillo and Rivera, who assisted pharmacies in ordering; and Proven had experience in avoiding law enforcement and regulatory scrutiny.

27. NAS's overall Schedule II dispensing after Atkinson's arrival reflected a focus on selling Commonly Abused Prescription Drugs to Houston area customers. From in or around 2017

through in or around May 2023, NAS sold Houston area pharmacies over 6.7 million Schedule II pills, nearly all of them Commonly Abused Prescription Drugs. In addition, during the same time period, NAS sold Houston area pharmacies millions of Potentiator pills and over 1,000 gallons of promethazine with codeine syrup.

28. Between approximately 2017 and early 2023, NAS realized gross proceeds of approximately $9,483,539.33 from sales of the Commonly Abused Prescription Opioids, Potentiators, and non-controlled substances to Houston area pharmacies facilitated by Weinstein, Atkinson, Smith, Pesserillo, and Rivera.

**Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute, Controlled Substances**
**(21 U.S.C. § 846, 21 U.S.C. § 841(a)(1))**

29. From in or around mid-2017, and continuing through in or around May 2023, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendant,

**ATLANTIC BIOLOGICALS CORPORATION,**

by and through its NAS business unit, did knowingly and willfully combine, conspire, confederate, and agree with Joshua Weinstein, Derrick Chad Atkinson, Jason Smith, and with others, known and unknown to the United States Attorney, to distribute and dispense, and to possess with the intent to distribute and dispense, a controlled substance, in a manner that **ATLANTIC BIOLOGICALS CORPORATION**, by and through its NAS business unit, and its co-conspirators knew and intended was not authorized by law, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that the controlled substances involved in the conspiracy attributable to defendant, and to the conduct of

other conspirators reasonably foreseeable to it, were mixtures and substances containing detectable amounts of oxycodone and hydrocodone, Schedule II controlled substances.

## FORFEITURE ALLEGATIONS

1. The allegations of this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **ATLANTIC BIOLOGICALS CORPORATION**, has an interest.

2. Upon conviction of a violation of Title 21, United States Code, Section 846, as alleged in this Information, the defendant shall forfeit to the United States any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such offense, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense, pursuant to Title 21, United States Code, Section 853.

3. The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, a sum that represents the total amount of funds involved in or derived from the alleged offense and may be sought as a forfeiture money judgment.

4. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to the forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 21, United States Code, Section 853.

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

LORINDA LARYEA
ACTING CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

MIRIAM GLASER DAUERMANN
ANDREW PENNEBAKER
TRIAL ATTORNEYS

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO.: **26-CR-20018-BLOOM/ELFENBEIN** |
| v. | |
| ATLANTIC BIOLOGICALS CORP., | **CERTIFICATE OF TRIAL ATTORNEY** |
| Defendant. | **Superseding Case Information:** |

**Court Division** (select one)
- [x] Miami
- [ ] Key West
- [ ] FTP
- [ ] FTL
- [ ] WPB

New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of new counts _____

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.
3. Interpreter: (Yes or No) No
   List language and/or dialect: _____
4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   - I  [x] 0 to 5 days
   - II [ ] 6 to 10 days
   - III [ ] 11 to 20 days
   - IV [ ] 21 to 60 days
   - V [ ] 61 days and over

   (Check only one)
   - [ ] Petty
   - [ ] Minor
   - [ ] Misdemeanor
   - [x] Felony

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Judge _____ Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes
   If yes, Judge David S. Leibowitz   Case No. 24-CR-60186
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) No
14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No
15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No
16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No

By: _____
ANDREW PENNEBAKER
DOJ Trial Attorney
SDFL Court ID No. A5502448

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name: _____ATLANTIC BIOLOGICALS CORP._____

Case No: _____

Count #:  1

Title 21, United States Code, Section 846

Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute
Controlled Substances
* Max. Term of Imprisonment:  N/A
* Mandatory Min. Term of Imprisonment (if applicable):  N/A
* Max. Supervised Release:  N/A
* Max. Fine:  $19,483,316

*Refers only to possible term of incarceration, supervised release and fines.  It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. **26-CR-20018-BLOOM/ELFENBEIN** |
| | ) | |
| ATLANTIC BIOLOGICALS CORP., | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*