UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  24-CR-20018-BLOOM/ELFENBEIN

UNITED STATES OF AMERICA

v.

ATLANTIC BIOLOGICALS CORP.,

**Defendant.**

_____/

## DEFERRED PROSECUTION AGREEMENT

Defendant Atlantic Biologicals Corp. (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), enter into this deferred prosecution agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Fraud Section will file the attached one-count criminal Information in the United States District Court for the Southern District of Florida charging the Company with conspiracy to illegally distribute and dispense, and to possess with the intent to distribute and dispense, controlled substances, including but not limited to oxycodone and hydrocodone, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C), as well as a criminal forfeiture allegation. In so doing, the Company: (a) knowingly waives any right it may have to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth

1

Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida; and (c) agrees that the charges in the Information and any charges arising from the conduct described in the Statement of Facts are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement.  The Fraud Section agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the facts described in the Statement of Facts are true and accurate.  The Company agrees that, effective as of the date the Company signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing.  In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines, or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

**Term of the Agreement**

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending two years from that date (the "Term").  The Company agrees, however, that, in the event the Fraud Section determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section's right to proceed as provided in Paragraphs 20 through 23 below.  Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period.  Conversely, in the event the Fraud Section finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

**Relevant Considerations**

4.      The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.      the nature and seriousness of the offense conduct, as described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts"), including the involvement of National Apothecary Solutions ("NAS"), one of the Company's two business lines, which business line commenced cessation of operations in or about January 2026, in selling over 14 million doses of opioids and opioid potentiators to pill mill pharmacies in the diversion "hot zone" of Houston, Texas;

3

b. the Company did not receive voluntary disclosure credit pursuant to the Criminal Division's Corporate Enforcement and Voluntary Self-Disclosure Policy ("Criminal Division CEP"), or pursuant to U.S.S.G. § 8C2.5(g)(1), because it did not voluntarily and timely disclose to the Fraud Section the conduct described in the Statement of Facts;

c. the Company received credit for its cooperation with the Fraud Section's investigation pursuant to U.S.S.G. § 8C2.5(g)(2) because it cooperated with the investigation and demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct; the Company also received credit for its cooperation pursuant to the Criminal Division CEP.  Such cooperation included, among other things, providing factual updates and presentations to the Fraud Section, making witnesses available for interviews, collecting and organizing voluminous evidence and information, including financial information, for the Fraud Section, and working with the Fraud Section's filter team to expeditiously review potentially privileged documents seized from Company premises pursuant to a search warrant and identify non-privileged documents for release to the prosecution team.  The Company's cooperation was, however, largely reactive and consisted primarily of compliance with legal process issued in connection with the investigation.  The Company did not make proactive disclosures;

d. the Company provided to the Fraud Section all relevant non-privileged facts known to it, including information about the individuals involved in the conduct described in the Statement of Facts and conduct disclosed to the Fraud Section prior to the Agreement;

e. the Company also received credit pursuant to the Criminal Division CEP because the Company engaged in remedial measures, including (i) voluntarily ceasing in May 2023 all controlled substance sales to independently-owned pharmacies in the United States and, later, voluntarily closing the NAS business line that was responsible for the offense conduct; (ii)

4

terminating the President of NAS and a sales representative for the business line involved in the offense conduct; and (iii) reviewing and modifying its compliance function, including by revising its standard operating procedures with respect to the sale of controlled substances, implementing an employee code of conduct, conducting salesperson trainings on rules and regulations governing the sale of controlled substances, and instituting on-site reviews for new customers.  Therefore, the Fraud Section determined that a discount of 5 percent off the statutory maximum fine was appropriate pursuant to the Criminal Division CEP based on the Company's cooperation and remediation;

f.     the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

g.     based on the Company's remediation and the state of its compliance program and the change in its risk profile, and the Company's agreement to report to the Fraud Section as set forth in Attachment D to this Agreement (Corporate Compliance Reporting), the Fraud Section determined that an independent compliance monitor was unnecessary;

h.     the Company has no prior criminal history;

i.     the Company has been the subject of prior administrative regulatory enforcement matters, including matters with the Drug Enforcement Administration pertaining to the Company's suspicious order monitoring program in connection with this matter, as well as its warehouse conditions; in June 2024, the Company entered into an administrative agreement with DEA under which DEA reissued the Company's controlled substances distribution licenses as part of a three-year agreement including enhanced compliance measures;

5

j.       the Company has agreed to continue to cooperate with the Fraud Section in any ongoing investigation as described in Paragraphs 5 and 6;

k.       the Company met its burden of establishing an inability to pay the criminal penalty sought by the Fraud Section.  The Fraud Section, with the assistance of a forensic accounting expert, conducted an independent ability to pay analysis, considering a range of factors outlined in the Justice Department's Inability to Pay Guidance (*see* October 8, 2019 Memorandum from Assistant Attorney General Brian Benczkowski to All Criminal Division Personnel re: Evaluating a Business Organization's Inability to Pay a Criminal Fine or Criminal Monetary Penalty), including but not limited to: (i) the factors outlined in 18 U.S.C. § 3572 and the United States Sentencing Guidelines § 8C3.3(b); (ii) the Company's current financial condition; (iii) the Company's alternative sources of capital; and (iv) the collateral consequences of the imposition of the full criminal penalty amount.  Based on that independent analysis, the Fraud Section determined that paying a criminal penalty greater than $450,000 would substantially threaten the continued viability of the Company; and

l.       accordingly, after considering (a) through (k) above, the Fraud Section has determined that the appropriate resolution of this case is a deferred prosecution agreement and a criminal penalty of $450,000.

### **Ongoing Cooperation and Disclosure Requirements**

5.       The Company shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Fraud Section or any other component of the Department of Justice at any time during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Fraud

6

Section, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, its subsidiaries or affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Fraud Section or any other component of the Department of Justice at any time during the Term. The Company's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Fraud Section a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such assertion. The Company agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.        The Company represents that it has timely and truthfully disclosed all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants relating to the conduct described in this Agreement and the Statement of Facts, as well as any other conduct under investigation by the Fraud Section at any time about which the Company has any knowledge. The Company further agrees that it shall promptly and truthfully disclose all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants about which the Company shall gain any knowledge or about which the Fraud Section may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section, upon request, any document, record or other tangible evidence about which the Fraud Section may

7

inquire of the Company including evidence that is responsive to any requests made prior to the execution of this Agreement.

b.  Upon request of the Fraud Section, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section the information and materials described in Paragraph 5(a) above on behalf of the Company.  It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.  The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d.  With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable laws and regulations, to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

6.  In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of violations by the Company of U.S. controlled substances laws including, but not limited to, the prohibitions on distribution of and possession with the intent to distribute controlled substances as set forth in 21 U.S.C. §§ 841 and 846, as well as the various

prohibitions and requirements of 21 U.S.C. § 843, the Company shall promptly report such evidence or allegation to the Fraud Section.

## Payment of Monetary Penalty

7.      The Fraud Section and the Company agree that under U.S.S.G. § 8C2.10, the appropriate fine for a controlled substance offense is determined by applying the provisions of 21 U.S.C. § 855, which provides that the applicable maximum fine is twice the gross proceeds of the crime.

8.      Consistent with the Criminal Division's policy on Evaluating a Business Organization's Inability to Pay a Criminal Fine or Criminal Monetary Penalty, despite agreeing that a larger amount otherwise would be appropriate based on the law and the facts, the Company also made representations to the Fraud Section, and provided supporting evidence, that the Company has an inability to pay the criminal penalty.  Based on those representations, the Fraud Section, with the assistance of a forensic accounting expert, conducted an independent inability-to-pay analysis, considering a range of factors outlined in the Justice Department's Inability to Pay Guidance (*see* October 8, 2019 Memorandum from Assistant Attorney General Brian Benczkowski to All Criminal Division Personnel re: Evaluating a Business Organization's Inability to Pay a Criminal Fine or Criminal Monetary Penalty), including but not limited to: (i) the factors outlined in 18 U.S.C. § 3572 and the United States Sentencing Guidelines § 8C3.3(b); (ii) the Company's current financial condition; and (iii) the Company's alternative sources of capital.  Based on that independent analysis, the Fraud Section determined that paying a criminal penalty greater than $450,000 would substantially threaten the continued viability of the Company.

9.      The Company agrees to pay a monetary penalty in the amount of $450,000 (the "Total Criminal Penalty") to the United States Treasury.  The Company agrees to pay $300,000

no later than  thirty (30) business days after the Agreement is fully executed, and $150,000 no later than seventy-five (75) business days after the Agreement is fully executed.  The Company and the Fraud Section agree that this penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement.  The Total Criminal Penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section that the Total Criminal Penalty is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.  The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of this $450,000 penalty.  The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or forfeiture or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

**Forfeiture**

10.	As a result of the Company's conduct, including the conduct set forth in the Statement of Facts, the parties agree that the Fraud Section could institute a civil and/or criminal forfeiture action against certain funds held by the Company and that such funds would be forfeitable pursuant to Title 21, United States Code, Section 853(a) and Title 28, United States Code, Section 2461(c).  The Company hereby admits that the facts set forth in the Statement of Facts establish that proceeds traceable to the commission of the offense are forfeitable to the

10

United States.  However, based on the Company's representations and independent analysis set forth in Paragraph 9 and the Company's agreement to pay a criminal penalty of $450,000, the parties agree that the Company is unable to pay a forfeiture amount.

11.     In the event of a breach of this Agreement and subsequent prosecution, the Fraud Section is not limited to forfeiture of funds identified in the Statement of Facts.

**Conditional Release from Liability**

12.     Subject to Paragraphs 20 through 23, the Fraud Section agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company, or any of its affiliates or subsidiaries, relating to any of the conduct described in the Statement of Facts or the criminal Information filed pursuant to this Agreement.  The Fraud Section, however, may use any information related to the conduct described in the Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.     This Agreement does not provide any protection against prosecution for any future conduct by the Company, or any of its subsidiaries or affiliates.

b.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company or any of its subsidiaries or affiliates.

**Corporate Compliance Program**

13.     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the Controlled

11

Substances Act ("CSA") throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities pertain in any way to controlled substances, including, but not limited to, the minimum elements set forth in Attachment C.

14. In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures regarding compliance with the CSA. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal controls designed to ensure that its sales of controlled substances comport with the CSA; and (b) a rigorous anti-diversion compliance program that incorporates relevant internal controls, as well as policies and procedures designed to effectively detect and deter violations of the CSA. The compliance program, including the internal controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.

### Corporate Compliance Reporting

15. The Company agrees that it will report to the Fraud Section annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C. These reports will be prepared in accordance with Attachment D.

16. On the date the Term expires, the Company, by the Managing Director and Compliance Lead, will certify to the Fraud Section, in the form of executing the document attached as Attachment F to this Agreement, that the Company has met its compliance obligations pursuant to this Agreement. Each certification will be deemed a material statement and representation by

the Company to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## **Deferred Prosecution**

17.     In consideration of the undertakings agreed to by the Company herein, the Fraud Section agrees that any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the Term.  To the extent there is conduct disclosed by the Company that is not set forth in the Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

18.     The Fraud Section further agrees that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within three (3) months after the Agreement's expiration, the Fraud Section shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts.  If, however, the Fraud Section determines during this three-month period that the Company breached the Agreement during the Term, as described in Paragraph 20, the Fraud Section's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 20 through 23, remains in full effect.

## **Breach of the Agreement**

19.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading

13

information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 14 through 17 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the CSA, would be a violation of the CSA; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Fraud Section becomes aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section in the U.S. District Court for the Southern District of Florida or any other appropriate venue. For the avoidance of doubt, the Company's financial viability, alone, is not a basis for breach of the Agreement. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Fraud Section's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of the CSA that occurs during the Term will be tolled from the date

14

upon which the violation occurs until the earlier of the date upon which the Fraud Section is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

20.     In the event the Fraud Section determines that the Company has breached this Agreement, the Fraud Section agrees to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining whether to pursue prosecution of the Company.

21.     In the event that the Fraud Section determines that the Company has breached this Agreement:  (a) all statements made by or on behalf of the Company to the Fraud Section or to the Court, including the Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be

imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

22.     The Company acknowledges that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.   The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

23.     On the date that the Term expires, the Company, by the Managing Director and the Controller, will certify to the Fraud Section in the form of executing the document attached as Attachment E to this Agreement that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement.   Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale, Merger, or Other Change in Corporate Form of Company

24.     Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the

16

obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Fraud Section's ability to determine a breach under this Agreement is applicable in full force to that entity.  The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void.  The Company shall provide notice to the Fraud Section at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form.  The Fraud Section shall notify the Company prior to such transaction (or series of transactions) if they have determined that the transaction or transactions will have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Fraud Section.  If at any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section may deem it a breach of this Agreement pursuant to Paragraphs 20 through 23 of this Agreement.  Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section.

### Public Statements

25.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth

17

in Paragraphs 20 and 21 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section.  If the Fraud Section determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Fraud Section shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

26.     The Company agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Company; and (b) whether the Fraud Section has any objection to the release.

27.     The Fraud Section agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the Fraud Section is

not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

### Limitations on Binding Effect of Agreement

28.     This Agreement is binding on the Company and the Fraud Section but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.  If the court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), all the provisions of this Agreement shall be deemed null and void, and the Term shall be deemed to have not begun, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

### Notice

29.     Any notice to the Fraud Section under this Agreement shall be given by electronic mail and/or personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Jacob Foster, Deputy Chief, Health Care Fraud Unit, Criminal Division, United States Department of Justice, 1400 New York Avenue Northwest, Washington, D.C. 20005.  Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, with copies by electronic mail, addressed to Mark Jensen, Esq., c/o King & Spalding LLP, 1700 Pennsylvania

19

Avenue NW, Washington, D.C. 20006.  Notice shall be effective upon actual receipt by the Fraud Section or the Company.

**<u>Complete Agreement</u>**

30.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Fraud Section.  No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section, the attorneys for the Company and a duly authorized representative of the Company.

**AGREED:**

**FOR ATLANTIC BIOLOGICALS CORP.:**

Date: 1/11/2026                               By: _____
                                                         Michael Correa
                                                         Managing Director

Date: _____                    By: _____
                                                         Mark Jensen, Esq.
                                                         Mark Brown, Esq.
                                                         Luke Fields, Esq.
                                                         King & Spalding LLP
                                                         Counsel for Atlantic Biologicals Corp.

**FOR THE DEPARTMENT OF JUSTICE:**

                                                         Lorinda I. Laryea
                                                         Acting Chief, Fraud Section
                                                         Criminal Division
                                                         United States Department of Justice

Date: _____                    By: _____
                                                         Miriam L. Glaser Dauermann
                                                         Andrew Pennebaker
                                                         Trial Attorneys

20

Avenue NW, Washington, D.C. 20006.  Notice shall be effective upon actual receipt by the Fraud

Section or the Company.

<strong><u>Complete Agreement</u></strong>

30.     This Agreement, including its attachments, sets forth all the terms of the agreement

between the Company and the Fraud Section.  No amendments, modifications or additions to this

Agreement shall be valid unless they are in writing and signed by the Fraud Section, the attorneys

for the Company and a duly authorized representative of the Company.

**AGREED:**

**FOR ATLANTIC BIOLOGICALS CORP.:**

Date: _____                    By:    _____

                                          Michael Correa
                                          Managing Director

Date: ____1/12/26____                    By:    _____
                                          Mark Jensen, Esq.
                                          Mark Brown, Esq.
                                          Luke Fields, Esq.
                                          King & Spalding LLP
                                          Counsel for Atlantic Biologicals Corp.

**FOR THE DEPARTMENT OF JUSTICE:**

                                        Lorinda I. Laryea
                                        Acting Chief, Fraud Section
                                          Criminal Division
                                        United States Department of Justice

Date: _____                    By:    _____
                                        Miriam L. Glaser Dauermann
                                        Andrew Pennebaker
                                        Trial Attorneys

Avenue NW, Washington, D.C. 20006.  Notice shall be effective upon actual receipt by the Fraud

Section or the Company.

**Complete Agreement**

30.     This Agreement, including its attachments, sets forth all the terms of the agreement

between the Company and the Fraud Section.  No amendments, modifications or additions to this

Agreement shall be valid unless they are in writing and signed by the Fraud Section, the attorneys

for the Company and a duly authorized representative of the Company.

**AGREED:**

**FOR ATLANTIC BIOLOGICALS CORP.:**

Date: _____          By: _____
                                     Michael Correa
                                     Managing Director

Date: _____          By: _____
                                     Mark Jensen, Esq.
                                     Mark Brown, Esq.
                                     Luke Fields, Esq.
                                     King & Spalding LLP
                                     Counsel for Atlantic Biologicals Corp.

**FOR THE DEPARTMENT OF JUSTICE:**

                                     Lorinda I. Laryea
                                     Acting Chief, Fraud Section
                                     Criminal Division
                                     United States Department of Justice

Date: 1/12/2026              By: _____
                                     Miriam L. Glaser Dauermann
                                     Andrew Pennebaker
                                     Trial Attorneys

20

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Atlantic Biologicals Corp. (the "Company").  I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms.  Before signing this Agreement, I consulted outside counsel for the Company.  Counsel fully advised me of the rights of the Company, of possible defenses, of the Controlled Substances Act's penalty provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company.  I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Controlled Substances Act's penalty provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement.  Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement.  I am also satisfied with outside counsel's representation in this matter.  I certify that I am the Managing Director for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: 1/11/2026

Atlantic Biologicals Corp.

By: _____
Michael Correa
Managing Director

21

**CERTIFICATE OF COUNSEL**

I am counsel for Atlantic Biologicals Corp. (the "Company") in the matter covered by this Agreement.  In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company.  Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Managing Director of the Company.  I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date:  ___1/12/26_____

By: _____
       Mark Jensen, Esq.
       King & Spalding LLP
       Counsel for Atlantic Biologicals Corp.

22

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and Atlantic Biologicals Corp. (the "Company").  The Company hereby agrees and stipulates that the following information is true and accurate.  The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.  Should the Fraud Section pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.  The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

<u>Relevant Individuals and Entities</u>

1.      At all times relevant to this Statement of Facts, the Company was a pharmaceutical wholesaler with its principal place of business in Miami, Florida, and its primary warehouse in North Carolina.  The Company had two distinct business units: Atlantic Biologicals, which served the hospital channel and has been the Company's primary business unit, and National Apothecary Solutions ("NAS"), which has been a smaller unit and did not serve the hospital channel.  The business of NAS, which is the sole business unit at issue in this Statement of Facts, was primarily focused on independently-owned pharmacies, to which it sold pharmaceutical opioids, other controlled and non-controlled drugs, and medical goods.  NAS ended its distribution of controlled substances to independently-owned pharmacies, in the Houston area and nationwide, in or around late May 2023.

A-1

2.      Joshua Weinstein ("Weinstein") resided in the Southern District of Florida, and held the title of President of NAS.  Weinstein was a salaried employee who did not earn commission on sales.  He separated from NAS in October 2024.

3.      Derrick Chad Atkinson ("Atkinson") resided in the Eastern District of North Carolina.  Atkinson was an independent contractor for Proven Rx Sales LLC ("Proven"), a third-party, purported pharmaceutical consulting company in Miami, Florida, and, beginning in around 2017, he also became a non-exclusive, independent sales representative contracted by NAS.  He became a full-time sales employee for NAS in September 2021.  He separated from NAS in June 2023.

4.      Jason Smith ("Smith") resided in the Southern District of Florida, and was the owner of Proven.  Joseph Pesserillo ("Pesserillo") and Cassandra Rivera ("Rivera"), both of whom resided in the Southern District of Florida, were employees of Proven.

Relevant Controlled Substances

5.      Hydrocodone was an opioid classified as a Schedule II controlled substance under the Controlled Substances Act ("CSA").  The highest-strength quick-release hydrocodone pill commercially available contained 10 mg of hydrocodone bitartrate and 325 mg of the non-narcotic analgesic acetaminophen ("hydrocodone 10-325").

6.      Oxycodone was an opioid classified as a Schedule II controlled substance under the CSA.  The highest-strength short-acting oxycodone pill commercially available contained 30 mg of oxycodone hydrochloride.

7.      Hydromorphone was an opioid classified as a Schedule II controlled substance under the CSA.  The highest-strength short-acting hydromorphone pill commercially available contained 8 mg of hydromorphone hydrochloride.

A-2

8.      Carisoprodol was a Schedule IV controlled substance under the CSA.  The highest-strength carisoprodol pill commercially available was the 350 mg pill.

9.      Alprazolam was a Schedule IV controlled substance under the CSA.  The highest-strength alprazolam pill commercially available was the 2 mg pill.

10.     Promethazine with codeine was a Schedule V controlled substance under the CSA.

11.     Hydrocodone, oxycodone, and hydromorphone are collectively referred to as the "Commonly Abused Opioids." Carisoprodol, alprazolam, and promethazine with codeine are collectively referred to as "Potentiators," for their reputation on the black market as enhancers of the high that illicit users sought from the Commonly Abused Opioids.  Together, the Commonly Abused Opioids and Potentiators are referred to as the "Commonly Abused Prescription Drugs."

The Conspiracy to Distribute Controlled Substances

*Conduct of Joshua Weinstein*

12.     In or around early 2017, Weinstein was approached by Atkinson, who at the time was working for Proven, about a business prospect that Atkinson said would generate large profits for NAS.  Atkinson had established a network of greater Houston-area[1] independent pharmacies willing to pay well over-market prices for the Commonly Abused Prescription Drugs.

13.     Thereafter, in 2017, NAS retained Atkinson as an independent contractor.  Because Atkinson's book of business was primarily in Houston, his contract facilitated sales by NAS to Houston-area pharmacy customers of the Commonly Abused Prescription Drugs and certain non-controlled drugs that NAS required the Houston-area pharmacies to purchase in a ratio of not less

---

[1] The greater Houston area included the following counties in the State of Texas: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

than four non-controlled-drug pills for every Commonly Abused Prescription Drug pill.  In 2015, NAS had created and implemented this 4:1 minimum purchasing ratio as a compliance control that subsequently would be circumvented, in part, in furtherance of the conduct as described herein.

14.     Weinstein became responsible for the account of Creative Care, a Houston-area pharmacy, in around June 2017, and serviced it until Creative Care's owner, Kesha Harris, was arrested for illegally selling Commonly Abused Opioids on or about August 28, 2019.

15.     Early in the course of handling the Creative Care account, Weinstein suspected that Creative Care was a pill-mill pharmacy—that Harris was dispensing the Commonly Abused Prescription Drugs she bought from NAS outside the usual course of professional practice, without a legitimate medical purpose.  Weinstein's suspicions were based on red flags for diversion, including:

a.   Creative Care's location in the Houston area "hot zone";

b.   Harris's interest in purchasing as many of the Commonly Abused Prescription Drugs as she could get from NAS;

c.   Harris's lack of concern for the non-controlled drugs NAS required her to purchase in order to order her limits of Commonly Abused Prescription Drugs;

d.   Harris's interest in brands and colors of the Commonly Abused Opioids, which legitimate pharmacy customers rarely exhibited; and

e.   Harris's willingness to pay well-over-market rates to acquire both the Commonly Abused Prescription Drugs and the non-controlled drugs required to meet NAS's ratios.

16.     Notwithstanding those red flags, Weinstein for a time remained deliberately ignorant and helped Harris increase her purchasing limits for the Commonly Abused Prescription Drugs, including by emailing Harris language to send back to him requesting a large increase, to create the (false) impression that Harris had drafted the request.  Weinstein used Harris's email to

A-4

obtain the requested increase in part.  In other instances, Weinstein picked for Creative Care the non-controlled drugs it needed to purchase to meet NAS's required purchasing ratio of controlled to non-controlled drugs.

17.     In around March 2019, Weinstein and Atkinson traveled to Houston and visited Creative Care.  The pharmacy was in a strip mall; there were metal bars on the outside-facing doors and windows; and there was nothing in the single-room customer area except for a few chairs and two small windows for "pick up/drop off" and "consultation." This was also consistent with Weinstein's assumption that Harris was diverting the Commonly Abused Prescription Drugs she purchased from NAS.

18.     Weinstein facilitated Harris's purchase from NAS of approximately 110,500 hydrocodone 10-325 mg pills and approximately 10,000 oxycodone 30 mg pills, which Weinstein knew and intended the owner would and did dispense outside the course of professional practice, without a legitimate medical purpose.

*Conduct of Chad Atkinson*

19.     Atkinson directly handled certain Houston-area pharmacy accounts through his independent contractor arrangement through Proven and, for a time, directly for NAS, including Ennis Street Pharmacy, Keystone Pharmacy, and certain networks of pharmacies operated by drug trafficking organizations ("DTOs") (collectively, the "Atkinson Pharmacies").

20.     Atkinson understood, based on red flags he observed, that the Atkinson Pharmacies purchased the Commonly Abused Prescription Drugs from NAS with the intent to distribute and dispense them outside the usual course of professional practice and without any legitimate medical purpose, that is, that the Atkinson Pharmacies diverted the Commonly Abused Prescription Drugs onto the black market.

A-5

21. Some of the red flags that caused Atkinson to understand that the Atkinson Pharmacies diverted the Commonly Abused Prescription Drugs included:

a. They rarely ordered any controlled drug, in any strength, other than the Commonly Abused Prescription Drugs.

b. They almost always ordered as many of the Commonly Abused Prescription Drugs as NAS would sell them per month;

c. They expressed strong preferences for Commonly Abused Prescription Drugs in certain colors, shapes, or from certain manufacturers;

d. They ordered non-controlled drugs in suspicious patterns, including almost always ordering large quantities and limited varieties, in exactly the number necessary to order their monthly limits of Commonly Abused Prescription Drugs, which NAS required them to purchase in no less than a 4:1 ratio of non-controlled to controlled drugs;

e. They were willing to pay well-over-market prices to acquire both the Commonly Abused Prescription Drugs and the non-controlled drugs required to meet NAS's ratios;

f. Their hours of operation were inconsistent with those of a legitimate pharmacy; and

g. Photos submitted with the pharmacies' applications to purchase depicted locations in strip malls, with bars on the windows and doors, and nothing for sale in the areas accessible to customers—just pick-up and drop-off windows.

22. Atkinson became aware in or around September 2019 that Ennis Street Pharmacy had its computers and equipment seized by law enforcement—an obvious red flag. Yet beginning in December 2019, Atkinson again sourced Commonly Abused Prescription Drugs from NAS to the pharmacy—even securing increases on the pharmacy's ordering limits—until a further law enforcement action that became public.

23. Atkinson facilitated sales from NAS to Ennis Street Pharmacy of 119,000 hydrocodone 10-325 mg pills between the seizure of its computers and the subsequent law enforcement action, which Atkinson understood would be distributed and dispensed unlawfully,

A-6

and which in fact were distributed and dispensed unlawfully, outside the usual course of professional practice, without a legitimate medical purpose.

24.     Atkinson helped Keystone's owner obtain Commonly Abused Prescription Drugs when Atkinson knew the owner was out of the country and Keystone was closed, specifically, he facilitated the sale of two months' worth of Commonly Abused Prescription Drugs (based on limits set by NAS) when Atkinson knew that Keystone had been closed for all but around a week of that timeframe.  In that way, Atkinson facilitated Keystone's purchase of 26,000 hydrocodone 10-325 mg pills and 1,400 oxycodone 30 mg pills, knowing the owner would distribute and dispense unlawfully, outside the usual course of professional practice and without any legitimate medical purpose.

25.     Atkinson understood that the pharmacies operated by the DTOs purchased Commonly Abused Prescription Drugs for unlawful distribution and dispensing based on the number of pharmacies for which individuals who led the DTOs ordered, and based on the way those individuals spoke about the Commonly Abused Prescription Drugs.  Atkinson understood both DTOs were purchasing Commonly Abused Prescription Drugs to unlawfully distribute and dispense them, and both DTOs did unlawfully distribute and dispense, outside the usual course of professional practice and without a legitimate medical purpose, at least approximately 10,500 hydrocodone 10-325 mg pills and 25,000 oxycodone 30 mg pills, which Atkinson helped them acquire from NAS for that purpose.

*Conduct of the Proven owner and employees*

26.     NAS retained Smith and Atkinson as independent contractors to obtain pharmacy customers and paid them hundreds of thousands of dollars in commissions, much of which went to Smith (and to Atkinson while a Proven independent contractor).  Through their relationship,

A-7

Smith, Pesserillo, and Rivera facilitated NAS's sale of Commonly Abused Prescription Drugs to multiple pharmacies in the greater Houston area.  NAS did not pay sales commissions to Pesserillo or Rivera.

27.     Proven facilitated NAS's sales to Chrisco Pharmacy, K-Med Pharmacy, and others in the greater Houston area that operated as pill-mill pharmacies.  Chrisco had little to no legitimate business and routinely sold entire shipments of controlled substances directly to street-level drug dealers.  In total, Chrisco purchased well over 1,000,000 dosage units of the Commonly Abused Prescription Drugs from NAS.  These included approximately 345,200 oxycodone 30 mg pills and 591,000 hydrocodone 10-325 mg pills.  Similarly, K-Med Pharmacy purchased approximately 470,000 dosage units of Commonly Abused Prescription Drugs from NAS, of which 196,000 were oxycodone 30 mg pills, 41,000 were hydrocodone 10-325 mg pills, and another 104,000 were promethazine with codeine.

28.     Many of Proven's greater Houston-area pharmacy accounts exhibited numerous red flags indicating diversion, including:

   a.  Substantially all the Schedule II controlled substances purchased and sold were the highest strength, quick-release generic forms of oxycodone and hydrocodone;

   b.  Substantially all the Schedule III-V controlled substances purchased and sold were carisoprodol 350 mg pills, alprazolam 2 mg pills, and promethazine with codeine syrup;

   c.  Houston pharmacies were required to purchase non-controlled and controlled substances in a ratio set by NAS; and

   d.  The pharmacies paid prices substantially above market rates.

29.     Between 2017 and May 2023, the gross proceeds that NAS realized from sales to Houston-area pharmacies of the Commonly Abused Opioids, Potentiators, and related non-

A-8

controlled substances totaled at least $2,508,735.85 based on sales to the pharmacies specifically

identified in this Statement of Facts.

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Atlantic Biologicals Corp. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues arising in relation to the unlawful distribution of controlled substances; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section; and

WHEREAS, the Company's Managing Director, Michael Correa, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section.

Therefore, the Board of Directors has RESOLVED that:

1.     The Company (a) acknowledges the filing of the single-count Information charging the Company with violating Title 21, United States Code, Section 846; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section; and (c) agrees to accept a monetary penalty against Company totaling $450,000, and to pay such penalty to the United States Treasury with respect to the conduct described in the Information;

2.     The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any

B-1

charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The Managing Director of Company, Michael Correa, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Managing Director of Company, Michael Correa, may approve;

4.      The Managing Director of Company, Michael Correa, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Managing Director of Company, Michael Correa, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: 1/11/2026

By: _____
Michael Correa, on behalf of
Atlantic Biologicals Corp.

B-2

**ATTACHMENT C**

**<u>CORPORATE COMPLIANCE PROGRAM</u>**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Controlled Substances Act ("Relevant Law"), Atlantic Biologicals Corp. (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal controls designed to ensure that its sales of controlled substances comport with the Relevant Law; and (b) a rigorous anti-diversion compliance program that incorporates relevant internal controls, as well as policies and procedures designed to effectively detect and deter violations of the Relevant Law.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to compliance with its corporate policy against violations of the Relevant Law, its compliance policies, and its Code of Conduct, and demonstrate rigorous support for compliance principles via their actions and words.

2.      The Company will ensure that mid-level management throughout its organization reinforce leadership's commitment to compliance policies and principles and encourage

C-1

employees to abide by them.   The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations at all levels of the Company.

*Periodic Risk Assessment and Review*

3.       The Company will implement a risk management process to identify, analyze, and address the individual circumstances of the Company, in particular the diversion risks facing the Company.

4.       On the basis of its periodic risk assessment, the Company shall take appropriate steps to design, implement, or modify each element of its compliance program to reduce the risk of violations of the Relevant Law, its compliance policies, and its Code of Conduct.

*Policies and Procedures*

5.       The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the Relevant Law, which shall be memorialized in a written compliance policy or policies.

6.       The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the Relevant Law and the Company's compliance policies and Code of Conduct, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the Relevant Law by personnel at all levels of the Company.   These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company, including all agents and business partners.  The Company shall notify all employees that compliance with policies and procedures related to the Relevant Law is the duty of individuals at all levels of the company.

C-2

7.      The Company will ensure that it has a system of anti-diversion procedures, including a system of internal controls, reasonably designed to ensure the prevention and detection of violations of Relevant Law.  The Company will ensure that it has a system of internal controls, reasonably designed to ensure the completeness and accuracy of records pertaining to its anti-diversion program.

8.      The Company shall review its anti-diversion compliance policies and procedures as necessary to address changing and emerging risks and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Independent, Autonomous, and Empowered Oversight*

9.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-diversion compliance policies and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Company's Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources, authority, and support from senior leadership to maintain such autonomy.

*Training and Guidance*

10.     Company will implement mechanisms designed to ensure that its Code of Conduct and anti-diversion compliance policies and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees

C-3

in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a risk of violating the Relevant Law, and, where necessary and appropriate, agents and business partners; and (b) metrics for measuring knowledge retention and effectiveness of the training.  The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

11.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-diversion compliance policies and procedures, including when they need advice on an urgent basis.

*Confidential Reporting Structure and Investigation of Misconduct*

12.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the Company's Code of Conduct or anti-diversion compliance policies and procedures and protection of directors, officers, employees, and, where appropriate, agents and business partners who make such reports.  To ensure effectiveness, the Company commits to following applicable anti-retaliation and whistleblower protection laws, and to appropriately training employees on such laws.

13.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of

C-4

violations of the Relevant Law or the Company's anti-diversion compliance policies and procedures.

*Compensation Structures and Consequence Management*

14.     The Company will implement clear mechanisms amongst all directors, officers, employees, and, where necessary and appropriate, parties acting on behalf of the Company, to incentivize behavior that complies with the Company's corporate policy against violations of the Relevant Law, its compliance policies, and its Code of Conduct.  These incentives shall include, but shall not be limited to, the implementation of criteria related to compliance in the Company's compensation and bonus system.

15.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the Relevant Law and the Company's Code of Conduct and anti-diversion compliance policies and procedures by the Company's directors, officers, and employees.  Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, Code of Conduct, and compliance policies and procedures and making modifications necessary to ensure the overall anti-diversion compliance program is effective.

*Third-Party Management*

16.     The Company will institute appropriate risk-based due diligence and compliance requirements regarding the Relevant Law that pertain to the retention and oversight of all agents and business partners, including:

a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.     informing agents and business partners of the Company's commitment to abiding by the Relevant Law, and of the Company's Code of Conduct and anti-diversion compliance policies and procedures; and

c.     seeking a reciprocal commitment from agents and business partners.

17.     The Company will engage in ongoing monitoring and risk management of third-party relationships through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

18.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the Relevant Law, which may, depending upon the circumstances, include:  (a) representations and undertakings relating to compliance with the Relevant Law; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any violation of the Relevant Law, the Company's Code of Conduct or compliance policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

19.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate Relevant Law due diligence by legal, accounting, and compliance personnel.

20.     The Company will ensure that the Company's Code of Conduct and compliance policies and procedures regarding the Relevant Law apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 10 above on the Relevant Law and the Company's compliance policies and procedures regarding the Relevant Law;

b.     where warranted, conduct an anti-diversion specific audit of all newly acquired or merged businesses as quickly as practicable;

c.     where warranted, establish a plan to integrate the acquired businesses or entities into the Company's enterprise resource planning systems as quickly as practicable.

*Monitoring and Testing*

21.     The Company will conduct periodic reviews and testing of all elements of its compliance program to evaluate and improve their effectiveness in preventing and detecting violations of the Relevant Law and the Company's Code of Conduct and anti-diversion compliance policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

C-7

22. The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.

*Analysis and Remediation of Misconduct*

23. The Company will conduct a root cause analysis of misconduct, including prior misconduct, to identify any systemic issues and/or any control failures. The Company will timely and appropriately remediate the root causes of misconduct. The Company will ensure that root causes, including systemic issues and controls failures, and relevant remediation are shared with management as appropriate.

**ATTACHMENT D**

**COMPLIANCE REPORTING REQUIREMENTS**

Atlantic Biologicals Corp. (the "Company") agrees that it will report to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") periodically. During the Term, the Company shall review, test, and update its compliance program and internal controls, policies, and procedures, including its anti-diversion measures, regarding compliance with the Controlled Substances Act ("Relevant Law") described in Attachment C. The Company shall be required to: (i) conduct an initial ("first") review and submit a first report and (ii) conduct and prepare at least one follow-up review and report, as described below. Prior to conducting each review, the Company shall be required to prepare and submit a workplan for the review.

In conducting the reviews, the Company shall undertake the following activities, among others: (a) inspection of relevant documents, including the Company's current policies, procedures, and training materials concerning compliance with the Relevant Law; (b) inspection and testing of the Company's systems procedures, and internal controls, including record-keeping and internal audit procedures at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons; and (d) analyses, studies, and comprehensive testing of the Company's compliance program.

*Written Work Plans, Reviews and Reports*

a.      The Company shall conduct a first review and prepare a first report, followed by at least one follow-up review and report.

b.      Within sixty (60) calendar days of the date this Agreement is executed, the Company shall, after consultation with the Fraud Section, prepare and submit a written work plan

D-1

to address the Company's first review. The Fraud Section shall have thirty (30) calendar days after receipt of the written work plan to provide comments.

c. With respect to any follow-up review and report, after consultation with the Fraud Section, the Company shall prepare a written work plan within forty-five (45) calendar days of the submission of the prior report, and the Fraud Section shall provide comments within thirty (30) calendar days after receipt of the written work plan.

d. All written work plans shall identify with reasonable specificity the activities the Company plans to undertake to review and test each element of its compliance program, as described in Attachment C.

e. Any disputes between the Company and the Fraud Section with respect to any written work plan shall be decided by the Fraud Section in its sole discretion.

f. No later than one year from the date this Agreement is executed, the Company shall submit to the Fraud Section a written report setting forth: (1) a complete description of its remediation efforts to date; (2) a complete description of the testing conducted to evaluate the effectiveness of the compliance program and the results of that testing; and (3) its proposals to ensure that its compliance program is reasonably designed, implemented, and enforced so that the program is effective in deterring and detecting violations of the Relevant Law. The report shall be transmitted to:

> Deputy Chief – HCF Unit
> Deputy Chief – CEC Unit
> Criminal Division, Fraud Section
> United States Department of Justice
> 1400 New York Avenue, NW
> Bond Building, Eleventh Floor
> Washington, D.C. 20005

The Company may extend the time period for issuance of the first report with prior written approval of the Fraud Section.

### *Follow-up Reviews and Reports*

g.      The Company shall undertake at least one follow-up review and report, incorporating the views of the Fraud Section on the Company's prior review and report, to further monitor and assess whether the Company's compliance program is reasonably designed, implemented, and enforced so that it is effective at deterring and detecting violations of the Relevant Law.

h.      The first follow-up ("second") report shall include a plan for ongoing improvement, testing, and review of the compliance program to ensure the sustainability of the program.  The second report shall be completed and delivered to the Fraud Section no later than thirty (30) days before the end of the Term.

i.      The Company may extend the time period for submission of the follow-up report with prior written approval of the Fraud Section.

### *Confidentiality of Submissions*

j.      Submissions by the Company, including the work plans and reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the submissions could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the submissions and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Fraud Section determines in its sole discretion that disclosure

would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

D-4

**ATTACHMENT E**

**CERTIFICATION**

To:    United States Department of Justice
Criminal Division, Fraud Section
Attention:  Chief of the Fraud Section

Re:    Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 6 of the deferred prosecution agreement ("the Agreement") filed on January 12, 2026 in the United States District Court for the Southern District of Florida, by and between the United States of America and Atlantic Biologicals Corp. (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 6 of the Agreement, and that the Company has disclosed to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") any and all evidence or allegations of conduct required pursuant to Paragraph 6 of the Agreement, which includes evidence or allegations of any violation of U.S. controlled substances laws including, but not limited to, the prohibitions on distribution of and possession with the intent to distribute controlled substances as set forth in 21 U.S.C. §§ 841 and 846, as well as the various prohibitions and requirements of 21 U.S.C. § 843, committed by the Company's employees or agents ("Disclosable Information").  This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes.  The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 6 and the representations contained in this certification

E-1

constitute a significant and important component of the Agreement and of the Fraud Section's determination whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify that they are the Managing Director and the Controller of the Company, respectively, and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Florida. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Florida.

Date: _____     Name (Printed): _____

Name (Signed): _____
Managing Director
Atlantic Biologicals Corp.

Date: _____     Name (Printed): _____

Name (Signed): _____
Controller
Atlantic Biologicals Corp.

E-2

**ATTACHMENT F**

**COMPLIANCE CERTIFICATION**

To:     United States Department of Justice
        Criminal Division, Fraud Section
        Attention:  Chief of the Fraud Section

Re:     Deferred Prosecution Agreement Certification

The undersigned certify, pursuant to Paragraph 17 of the Deferred Prosecution Agreement filed on January 12, 2026, in the United States District Court for the Southern District of Florida, by and between the United States of America and Atlantic Biologicals Corp. (the "Company") (the "Agreement"), that the undersigned are aware of the Company's compliance obligations under Paragraphs 14-17 of the Agreement, and that, based on a review of the Company's reports submitted to the Department of Justice, Criminal Division, Fraud Section pursuant to Paragraph 16 of the Agreement, the reports are true, accurate, and complete.

In addition, the undersigned certify that, based on the undersigned's review and understanding of the Company's anti-diversion compliance program, the Company has implemented an anti-diversion compliance program that meets the requirements set forth in Attachment C to the Agreement.  The undersigned certifies that such compliance program is reasonably designed to detect and prevent violations of the CSA throughout the Company's operations.

The undersigned hereby certify that they are respectively the Managing Director of the Company and the Compliance Lead of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of

F-1

the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Florida.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Florida.


Date: _____     Name (Printed): _____

                                 Name (Signed): _____
                                 Managing Director
                                 Atlantic Biologicals Corp.


Date: _____     Name (Printed): _____

                                 Name (Signed): _____
                                 Compliance Lead
                                 Atlantic Biologicals Corp.

F-2